# Exhibit A

EFiled:  Apr 19 2024 09:09AM EDT
Transaction ID 72784035
Case No. N24C-04-184 PAW

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MARIANNE GAMBLE and
JAMES GAMBLE, her husband,

        Plaintiffs,

v.

EXACTECH, INC.,
a Florida corporation; and
EXACTECH US, INC.,
a Florida corporation,

        Defendants.

C.A. No. N24C-__-___

**Jury Trial of Twelve Demanded**

## SUMMONS

**THE STATE OF DELAWARE,
TO THE SHEFIFF OF NEW CASTLE COUNTY
YOU ARE COMMANDED:**

To summon the above–named defendant, Exactech US, Inc., so that within 20 days after service hereof upon defendant, exclusive of the day of service, defendant shall serve upon ANDREW C. DALTON, ESQUIRE, plaintiffs' attorney, whose address is 1106 West 10th Street, Wilmington, DE 19806, an Answer to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

To serve upon defendant a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by plaintiffs).

Dated: 4-25-24

Colleen Redmond
Chief Deputy Prothonotary



Per Deputy

**TO THE ABOVE – NAMED DEFENDANT:**

In case of your failure within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiffs' attorney named above an answer to the Complaint (and, if an Affidavit of Demand has been filed, and Affidavit of Defense), judgement by default will be rendered against you for the relief demanded in the Complaint (or Affidavit of Demand, if any).

Colleen Redmond
Prothonotary

Per Deputy

EFiled:  Apr 19 2024 09:09AM EDT
Transaction ID 72784035
Case No. N24C-04-184 PAW

**SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS)**

COUNTY:  **N**  K  S          CIVIL ACTION NUMBER: _____

CIVIL CASE CODE:  **CPRL**          CIVIL CASE TYPE: **Products Liability**

| CAPTION:<br><br>**MARIANNE GAMBLE and<br>JAMES GAMBLE, her husband,**<br><br>Plaintiffs,<br><br>v.<br><br>**EXACTECH, INC.,**<br>a Florida corporation; and<br>**EXACTECH US, INC.,**<br>a Florida corporation,<br><br>Defendants. | NAME AND STATUS OF PARTY FILING DOCUMENT:<br>MARIANNE GAMBLE and JAMES GAMBLE<br><br>DOCUMENT TYPE: (E.G., COMPLAINT, ANSWER WITH COUNTERCLAIM) **COMPLAINT**<br><br><br>NON-ARBITRATION - ____√____<br>(CERTIFICATE OF VALUE MAY BE REQUIRED)<br>Arbitration_ _Mediation__Neutral Assessment__<br>Defendant (Circle One) ACCEPT REJECT<br>JURY DEMAND YES_√_ NO____<br><br>TRACK ASSIGNMENT REQUESTED: (CIRCLE ONE)<br><br>EXPEDITED **STANDARD** COMPLEX |
| ATTORNEY NAME(S):<br>**Andrew C. Dalton #5878**<br><br>FIRM NAME:  **Dalton & Associates, P.A.**<br><br>ADDRESS:<br>**1106 West 10th Street<br>Cool Spring Meeting House<br>Wilmington, DE  19806**<br><br>TELEPHONE NUMBER: **(302) 652-2050**<br>FAX NUMBER: **(302) 652-0687**<br>E-MAIL ADDRESS:<br>**adalton@dalton.law** | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION<br>AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS<br>EXPLAIN THE RELATIONSHIP(S):<br>OTHER UNUSUAL ISSUES THAT EFFECT CASE MANAGEMENT:<br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES) |

THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.

EFiled:  Apr 19 2024 09:09AM EDT
Transaction ID 72784035
Case No. N24C-04-184 PAW

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MARIANNE GAMBLE and
JAMES GAMBLE, her husband,

        Plaintiffs,

v.

EXACTECH, INC.,
a Florida corporation; and
EXACTECH US, INC.,
a Florida corporation,

        Defendants.

C.A. No. N24C-__-___

**Jury Trial of Twelve Demanded**

## COMPLAINT

### A.    The Parties

1.    Plaintiffs MARIANNE GAMBLE (hereinafter "Plaintiff Gamble") and her husband, JAMES GAMBLE are adult residents of the State of Delaware residing at 829 Stella Street, Smyrna, DE  19977.

2.    Defendant EXACTECH, INC. is a Florida corporation doing business in the State of Delaware and whose registered agent is Corpdirect Agents, Inc., 1209 Orange Street, Wilmington, DE  19801.

3.    Defendant EXACTECH US, INC. is a Florida corporation doing business in the State of Delaware and whose registered agent is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE  19808. Defendant EXACTECH US, INC. is a wholly-owned subsidiary of Defendant EXACTECH, INC.

4.      Defendant EXACTECH, INC. has stated in documents filed with SEC, "We market our orthopaedic implant products in the United States through Exactech U.S., Inc., which operates through a network of independent sales agencies and direct sales representatives. These organizations, along with their independently contracted personnel, serve as our sales representatives."

5.      Defendants EXACTECH, INC. and EXACTECH US, INC. are hereinafter collectively referred to as "Defendant Exactech."

6.      At all times relevant to this action, Defendant Exactech was involved in the business of designing, developing, studying, researching, testing, formulating, licensing, manufacturing, assembling, inspecting, packaging, labeling, storing, preparing, promoting, marketing, advertising, distributing, selling, supplying, and introducing into interstate commerce, either directly or indirectly, through third parties or related entities, numerous orthopedic products, including the components of the Exactech Optetrak Posterior Stabilized (PS) Knee System and Exactech Optetrak Logic PS Total Knee System hereinafter ("Optetrak Device") as well as monitoring and reporting adverse events, and having a role in the decision process and response of Defendant Exactech, if any, related to these adverse events.

7.      At all times relevant to this action, Defendant Exactech designed, developed, tested, licensed, manufactured, assembled, packaged, labeled, prepared,

marketed, distributed, sold, supplied, and introduced into interstate commerce the components of the defective Optetrak Device.

## B.     Factual Background

### Plaintiff Marianne Gamble's Exactech Optetrak Devices

8.      On or about August 10, 2012, Plaintiff Gamble underwent a Right Total Knee Arthroplasty, using unknown DePuy components, performed by Dr. Edward Ford at Capital Health Medical Center Hopewell.

9.      Postoperatively, Plaintiff Gamble complained of pain and clicking in the Right Knee during several postop visits. Multiple x-rays and a Bone Scan showed that the Right Knee prosthesis was in excellent position with no evidence of loosening or acute osteomyelitis.

10.     On or about May 21, 2014, Plaintiff Gamble followed up with Dr. Ford for complaints of her Right Knee shifting then causing pain. An x-ray was obtained of the Right Knee, which showed no abormalities. Dr. Ford's impression was that she had a ruptured Right Posterior Cruciate Ligament and gave her the options of bracing or revision surgery.

11.     In or about July 2014, Plaintiff Gamble sought a second opinion with Dr. Norman A. Johanson, now deceased, at Hahnemann University Hospital, now

defunct. An x-ray was obtained of the Right Knee, which showed normal positioning and no evidence of hardware failure.

12. On or about October 7, 2015, Plaintiff Gamble had a follow-up x-ray of the Right Knee, which showed the prosthesis in normal alignment and a new round lucency at the medial aspect of the tibial prosthesis.

13. On or about December 10, 2015, Plaintiff Gamble underwent a Revision Right Total Knee Arthroplasty, performed by Dr. Johnson at Hahnemann University Hospital, for Right Knee instability. Plaintiff Gamble received components of Defendant Exactech's Optetrak Device, including Optetrak Tibial Insert & Scw Constrained Condylar; Optetrak 1/2 Tibial Augmentation Block and Screws, Cemented; Optetrak CC Stem Ext. Adapter & Screw; Optetrak Tibial Tray Trapezoid, Cemented; Optetrak Femoral Component Constrained Condylar, Cemented; Optetrak Fluted Stem Extension Femoral and Tibial; and Optetrak 3 Peg Patella Cemented.

14. Postoperative x-rays of the Right Knee showed the prosthesis in satisfactory alignment with no evidence of hardware failure.

15. On or about March 17, 2016, Plaintiff Gamble underwent a Left Total Knee Arthroplasty, performed by Dr. Johnson at Hahnemann University Hospital, for degenerative joint disease. Plaintiff Gamble received components of Defendant Exactech's Optetrak Device, including Optetrak Logic Tibial Insert; Optetrak Logic

Fit Tibial Tray; Optetrak Logic Femoral Component; and Optetrak 3 Peg Patella Cemented.

16.    Postoperative x-rays of the Right Knee and Left Knee showed the prosthesis in satisfactory alignment with no evidence of hardware failure.

17.    In or about 2017, Plaintiff Gamble moved to Delaware.

18.    On or about November 2, 2017, Plaintiff Gamble began treating with Dr. Drew Bray at First State Orthopaedics, for complaints of bilateral knee pain. X-rays were obtained of the bilateral knees, which showed the components to be well placed and no evidence of loosening.

19.    On or about May 2, 2022, Plaintiff Gamble saw Dr. James Costanzo at First State Orthopaedics, for complaints of Left Knee pain. X-rays were obtained of the bilateral knees, which showed a well-positioned Right Total Knee Arthroplasty without evidence of loosening and complete loss of joint space on the medial side of the Left Knee indicating significant polyethylene wear and a concern for a loose femoral component given lucency under the component especially at the anterior chamfer and anterior flange. Given Plaintiff Gamble's long-term issues with the Left Knee, evidence of loosening, polyethylene wear, and laxity, Dr. Costanzo recommended a complete revision of the Left Knee.

20.    During this visit, on or about May 2, 2022, or subsequently thereafter, Dr. Costanzo informed Plaintiff Gamble that, during her March 17, 2016 Left Total

Knee Arthroplasty, she received Defendant Exactech's Optetrak Device, that had been recalled in 2021.

21. On or about September 9, 2022, Plaintiff Gamble underwent a Revision of the Left Total Knee Arthroplasty femoral, tibial, and patellar components using Stryker components, performed by Dr. Costanzo at Christiana Hospital. During the surgery, Dr. Costanzo found significant polyethylene wear and pitting of the tibial insert; polyethylene wear of the patellar component; osteolysis of the tibia and femur; and a loose femoral component.

22. Postoperative x-rays of the Left Knee showed well-positioned left knee revision arthroplasty with no signs of fracture of loosening.

23. On or about June 16, 2023, Plaintiff Gamble followed up with Dr. Costanzo and reported Left Knee pain, decreased range of motion, and instablity. Dr. Costanzo's assessment was new left knee buckling without clear etiology.

**Exactech Optetrak Device**

**I.   510(k)**

24. Defendant Exactech's Optetrak Device is classified as a knee joint patellofemorotibial polymer/metal/polymer semi-constrained cemented prosthesis. It features a mix of polyethylene and metal-based components. The Optetrak Device is comprised of the following parts: a plastic patellar cap, femoral cap, plastic tibial

insert and tibial tray. The patellar cap and tibial insert are made of Ultra High Molecular Weight Polyethylene ("UHMWPE") plastic.

25. Defendant Exactech describes the "intended use" for the Optetrak Device as being indicated for use in skeletally mature individuals undergoing primary surgery for total knee replacement ("TKA") due to osteoarthritis, osteonecrosis, rheumatoid arthritis, and/or post traumatic degenerative problems. They are also indicated for revision for failed previous reconstructions where sufficient bone stock and soft tissue integrity are present.

26. In 1994, Defendant Exactech introduced the Optetrak Posterior Stabilized (PS) Knee System based on technology licensed from The Hospital for Special Surgery's patented 913 design and the Insall/Burstein ("I/B") knee system.

27. On February 26, 1996, Defendant Exactech obtained 510(k) clearance from the Food and Drug Administration ("FDA") for the Optetrak Posterior Stabilized (PS) Knee System.

28. In 2009, Defendant Exactech introduced the Optetrak Logic PS Total Knee System as the next generation of its Optetrak knee system. According to the Defendants, the differences in the design between the Optetrak PS System and Optetrak Logic were limited to the following: 1) the intercondylar femoral box was modified to preserve more bone during implantation; 2) increased flexion to 145°; 3) articulation between the anterior face of the post and the anterior surface of the

intercondylar box was modified to reduce the contact stress and edge loading in the polyethylene of the tibial post; and 4) the creation of "half sizes" that would purportedly allow for better fit. Upon information and belief, no other changes were made in the design.

29.    On January 11, 2010, Defendant Exactech obtained 510(k) clearance from the FDA for the Optetrak Logic PS Total Knee System.

30.    Despite alterations of these devices designs over the years, all of the polyethylene inserts used in Defendant Exactech's Knee Devices were created from the same material, formulation, and manufacturing process, as discussed further below. Accordingly, they all contained the same defects: they remained moderately crosslinked, without proper thermal treatment of the irradiated UHMWPE to rid the polyethylene of free radicals, without proper packaging to protect against in vitro oxidation, without proper quality control of aging inventory, without a safe expiration date, and without proper warnings to surgeons concerning the risks of these Devices.

## II.    **Design and Manufacturing**

31.    Ultra High Molecular Weight Polyethylene (UHMWPE) plastic has been used as the predominant bearing material (the polymer tibial insert or polyethene insert) in total knee arthroplasty since industry acceptance in the 1970s and 1980s.

32. UHMWPE, in its original form, is a resin powder and accordingly must be consolidated into a uniform solid before it can be used in the production of medical devices. The three methods for consolidation include ram extrusion, compression molding, and direct compression molding (DCM), sometimes referred to as net compression molding.

33. With DCM, UHMWPE is converted into sheet under controlled time, pressure, and temperature and then turned into rod or other shapes to facilitate machining operations by orthopedic manufacturers. Using DCM, the manufacturer converts the resin into finished or semifinished components.

34. The predominant industry standard for consolidation is sheet compression molding. Defendant Exactech deviates from this standard through its utilization of direct compression molding to produce its knee inserts.

## III. Sterilization

35. Historically, manufacturers of orthopedic implant devices used two main types of sterilization processes to sterilize the polyethylene components prior to delivery to surgeons: gamma radiation and ethylene oxide ("ETO").

36. As early as the 1960s, it was found that exposing UHMWPE to high-energy radiation during the sterilization process altered the crystalline structure of polyethylene by creating crosslinking within the polymer structure, which enhanced

the wear characteristics of the UHMWPE by decreasing the wear rate as exposure to gamma radiation increased.

37. In the 1990s, orthopedic implant manufacturers started using highly cross-linked polyethylene ("HXLPE") to increase the wear resistance of the UHMWPE. HXLPE was clinically introduced in 2001 for the tibial inserts in total knee arthroplasties.

38. Specifically, in the late 1990s, manufacturers determined that exposing polyethylene knee inserts to gamma radiation in a range between 50 to 100 kilogray (kGy) created a highly crosslinked polyethylene that performed well in wear testing. Accordingly, to achieve more dense crosslinking to decrease wear, they started to use gamma radiation above the 25 to 40 kGy range, which had been the typical range for sterilization of polyethylene knee inserts.

39. Exposing UHMWPE to radiation, however, has risks associated with the degradation of the polymer over time through an oxidative process.

40. Exposing UHMWPE to high-energy radiation breaks the carbon-hydrogen chains and creates highly reactive free radicals that recombine with adjacent molecules that form the crosslinking.

41. The crosslinking density increases with the higher the dose of radiation. If the highly reactive free radicals are exposed to oxygen, a process of oxidative degradation takes place leading to the embrittlement of the polyethylene.

42.    Even after the irradiation induced crosslinking process, there will remain highly reactive residual free radicals that, if exposed to oxygen during storage and clinical use can lead to an oxidation cascade that will degrade the polyethylene.

43.    The oxidative degradation of the polyethylene component of the knee implant device clinically can lead to accelerated wear resulting in adverse tissue reactions, such as periprosthetic osteolysis and tissue necrosis.

44.    For decades, knee implant manufacturers have used thermal treatments (annealing or remelting) to address the risks associated with the creation of residual free radicals as part of the radiation process.  Specifically, post-irradiation remelting, heating the polyethylene past its melting point of 135 degrees Celsius, eliminates free radicals.

45.    Manufacturers that anneal the crosslinked polyethylene tibial inserts below the melting point will barrier-package the insert, making the packaging impermeable to oxygen.  Without this barrier-packaging, the oxidative degenerative process will continue during storage.

46.    Furthermore, infusing the crosslinked polyethylene with vitamin E is a common added measure against oxidation.  In 2007, vitamin E infused polyethylene components of orthopedic implant devices were on the market.

47.     The physiologic response to polyethylene wear debris (e.g. osteolysis) has been studied from the beginning of the use of UHMWPE as part of knee implant devices and continues to be a point of study.

48.     Osteolysis is an immunologic adverse bodily reaction of bone degeneration (bone resorption) where the tissue is destroyed as a part of a pathological response to inflammation.

49.     Periprosthetic Osteolysis is osteolytic bone resorption associated with an autoimmune response to chronic inflammation caused by particle wear debris from implanted medical devices.  Periprosthetic osteolysis may result in the failure of a knee implant device.

50.     Periprosthetic Osteolysis associated with UHMWPE wear debris in knee implant devices is a recognized phenomenon that may occur in a small percentage of patients over time after years of exposure to polyethylene wear debris.

51.     Periprosthetic Osteolysis may result in catastrophic failure of the knee implant device by destroying the bony integration between the component parts of the prosthetic and the patient's anatomy resulting in loose components.  Such failure requires corrective surgery to replace the components of the knee implant device (revision surgery).

52.    In some cases, Periprosthetic Osteolysis destroys portions of the patient's femur and/or tibia. These types of failures greatly increase the complications of corrective surgeries and outcomes for patients.

53.    Historically, in the small percentage of patients that experience periprosthetic osteolysis, device failure typically occurs after more than fifteen years of service.

54.    Early failures of knee implant devices due to periprosthetic osteolysis are associated with increased amounts of polyethylene wear debris as part of an accelerated wear process.

55.    Periprosthetic Osteolysis is not the only adverse reaction to accelerated wear debris. Adverse local tissue reactions such as soft tissue necrosis, bone tissue necrosis, periprosthetic fluid collection, and muscle tissue necrosis, are some but not all of the complications associated with accelerated polyethylene wear debris.

56.    HXLPE is the predominant industry standard bearing material for the tibial insert component of TKAs, particularly when used in tandem with proper thermal treatment and vitamin E dosing. The highly crosslinked polyethylene provides increased wear resistance over traditional UHMWPE or moderately crosslinked products. Post crosslinked thermal treatments (annealing or remelting) are employed to quench any remaining free radicals that could otherwise contribute

to future damage by oxidation. Infusing the UHMWPE with vitamin E is commonly employed as an added measure against oxidation.

57.    In 2011, Defendant Exactech acknowledged in its Optetrak Logic Design Rationale marketing brochure that the manufacturing, packaging, and sterilization processes have a significant impact on the resulting properties of the final polyethylene components; that variations in consolidation, oxidation level, amount of cross-linking, and mechanical properties can have a pronounced effect on the wear performance and longevity of the implant, and that post consolidation treatments, such as radiation, annealing, and re-melting can be used to improve the wear characteristics of the polyethylene device.

58.    Yet, deviating from the industry standard, Defendant Exactech chose to use moderately crosslinked polyethylene (UHMWPE) for the bearing material of its tibial inserts without providing sufficient thermal treatment after crosslinking to fully quench the free radicals spawned by its crosslinking process.    Nor did Defendant Exactech add an antioxidant to its UHMWPE.

59.    Specifically, Defendant Exactech represents that its Knee Devices' net compression molded polyethylene is sterilized with gamma radiation (2.5-4.0 Mrad) in a vacuum.

60.    In 2010, Defendant Exactech claimed in its Optetrak Main Brochure, "[w]hile the molecular chains of net molded polyethylene are moderately

crosslinked due to the irradiation process in the absence of oxygen molecules, this material retains all of its mechanical properties (yield strength, fatigue strength and fracture resistance), avoiding the generation of free radicals. This balances the equation between wear, mechanical properties, and oxidation."

64. Defendant Exactech knew or should have known that its manufacturing processes would introduce free radicals into the knee insert but it did not employ thermal treatments recognized in the industry to eliminate or reduce the production of free radicals.

65. Defendant Exactech knew or should have known that the unquenched free radicals it introduced into the product would create a fertile postproduction environment for oxidation and oxidative generation of the UHMWPE insert throughout the product's shelf life.

66. Defendant Exactech's manufacturing process defect was exacerbated by use of gamma sterilization and out-of-specification packaging.

67. Accordingly, as set forth herein, the Defendant Exactech's Optetrak Device are all adulterated and misbranded medical devices and subject to recall due to accelerated wear of their UHMWPE inserts.

**IV. Packaging**

a. **The C.F.R. and Current Good Manufacturing Practices**

68.    Pursuant to federal law, all medical devices must follow regulations that set forth Current Good Manufacturing Practices.

69.    Pursuant to 21 U.S.C. § 351, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities, or controls used for its manufacture, packing, storage, or installation are not in conformity with federal requirements.

70.    Pursuant to 21 U.S.C. § 352, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof.

71.    Pursuant to 21 U.S.C. § 360(i), manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices. In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury. Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or

removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health.

72.     Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device, but not including an evaluation of the safety or effectiveness of a device), packaging, storage, and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law.

73.     The regulations requiring conformance to good manufacturing practices are set forth in 21 C.F.R. § 820, et seq. As explained in the Federal Register, because the Current Good Manufacturing Practice (CGMP) regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device.  Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured and the manufacturing processes employed.  Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to

comply with and implement the basic requirements set forth in the quality system regulations.

74.    Pursuant to 21 C.F.R. § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under Section 501(h) of the Federal Drug & Cosmetic Act ("the Act"). 21 U.S.C. § 351.

75.    Pursuant to 21 C.F.R. § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured.    "Quality system" means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management. 21 C.F.R. § 820.3(v).

76.    Pursuant to 21 C.F.R. § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

77.    Pursuant to 21 C.F.R. § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

78.    Pursuant to 21 C.F.R. § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

79.    Pursuant to 21 C.F.R. § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

80.    Pursuant to 21 C.F.R. § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

81.    Pursuant to 21 C.F.R. § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design. Design validation shall be performed under defined operating conditions on initial production units, lots or batches, or their equivalents. Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

82.    Pursuant to 21 C.F.R. § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

83.    Pursuant to 21 C.F.R. § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation.

84.    Pursuant to 21 C.F.R. § 820.50, each manufacturer shall establish and maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements.  Furthermore, each manufacturer shall evaluate and select suppliers, contractors, and consultants on the basis of their ability to meet specified requirements, including quality requirements.  This evaluation must be documented.  Finally, each manufacturer shall establish and maintain data that clearly describe or reference the specified requirements, including quality requirements, for purchase or otherwise received products or services.

85.    Pursuant to 21 C.F.R. § 820.70(a), each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications.  Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.

86.    Such process controls shall include:

a.    documented instructions, standard operating procedures (SOPs) and methods that define and control the manner of production;

b.    monitoring and control of process parameters and component and device characteristics during production;

c.    compliance with specified reference standards or codes;

     d.     the approval of processes and process equipment; and

     e.     criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples.

87.    Pursuant to 21 C.F.R. § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure.

88.    Pursuant to 21 C.F.R. § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

89.    Pursuant to 21 C.F.R. § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

90.    Pursuant to 21 C.F.R. § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning, and use.

91.   Pursuant to 21 C.F.R. § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

92.   Pursuant to 21 C.F.R. § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate computer software for its intended use according to an established protocol.

93.   Pursuant to 21 C.F.R. § 820.72, each manufacturer shall ensure that all inspection, measuring and test equipment, including mechanical, automated, or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results.  Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked, and maintained.

94.   Pursuant to 21 C.F.R. § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing by objective evidence that a process

consistently produces a result or product meeting its predetermined specifications. See 21 C.F.R. § 820.3(z)(1).

95. Pursuant to 21 C.F.R. § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each manufacturer shall ensure that validated processes are performed by qualified individuals.

96. Pursuant to 21 C.F.R. § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

97. Pursuant to 21 C.F.R. § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

    a. analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product or other quality problems;

    b. investigating the cause of nonconformities relating to product, processes, and the quality system;

c.    identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

d.    verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

e.    implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

f.    ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

g.    submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

98.    Pursuant to 21 C.F.R. § 820.130, each manufacturer is required to ensure that device packaging and shipping containers are designed and constructed to prevent the device from alteration or damage during the customary conditions of processing, storage, handling, and distribution.

99.    Pursuant to 21 C.F.R. § 820.140, each manufacturer shall establish and maintain procedures to prevent damage, deterioration, contamination, and other adverse effects to their products during handling.

100.    Pursuant to 21 C.F.R. § 820.150, each manufacturer shall establish and maintain procedures to prevent damage, deterioration, contamination, and other adverse effects to their products pending use or distribution.    Likewise, each manufacturer is required to ensure that no obsolete, rejected, or deteriorated product is used or distributed.    When the quality of a manufacturer's products deteriorate over time, the manufacturer is required to store their products in a manner to facilitate proper stock rotation and inspection of product condition.

101.    Pursuant to 21 C.F.R. § 820.160, each manufacturer shall establish and maintain procedures to ensure that expired products or devices deteriorated beyond acceptable fitness for use are not distributed.

102.    Pursuant to 21 C.F.R. § 820.170, each manufacturer shall establish and maintain adequate installation and inspection instructions, including directions for ensuring proper installation so that the device will perform as intended after installation. Such instructions must be distributed with the device or made available to the person installing the device.

103.    Pursuant to 21 C.F.R. § 820.198, each manufacturer shall maintain complaint files. Specifically, each manufacturer is required to establish and maintain

procedures for receiving, reviewing, and evaluating complaints. These procedures must ensure that all complaints involving the possible failure of a device, labeling, or packaging to meet any of the manufacturer's specifications are processed, documented, reviewed, evaluated, investigated, and reported to FDA as required by federal regulations.

104. Pursuant to 21 C.F.R. § 803.50, each manufacturer shall file a report with the FDA no later than 30 calendar days after becoming aware of information, from any source, that reasonably suggests that the manufacturer's device (1) may have caused or contributed to a death or serious injury or (2) has malfunctioned and this device or a similar device would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur.

**b.** **Industry Standards**

105. In addition to these federal requirements, industry standards require medical device manufacturers such as Defendant Exactech to utilize an appropriate packaging system to ensure the safety of sterilized medical devices, like the Optetrak Device.

106. Industry standards and regulatory authorities like the FDA recognize the critical nature of packaging materials by considering them as an accessory or a component of a medical device.

107. Medical devices must be transported and stored under conditions that ensure that the performance characteristics of the product remain within the specified limits.

108. Medical device packaging must be designed to minimize the safety risks and health risks to the patient under the intended specified conditions of use.

109. A medical device manufacturer is required to have procedures for the design and development of packaging systems, and they must be established, documented, implemented, and maintained.

110. The design and development of a medical device package system must consider many factors, including but not limited to: the sensitivity of the product to particular risks including oxidation, radiation, moisture, and temperature, the storage environment, the distribution and handling environment, and the expiry date limitations of the product.

111. Medical device packaging must provide adequate protection to the medical device during the hazards of handling, distribution, and storage.

112. Performance testing must be conducted on packaging systems comprised of the worst-case sterile barrier system as well as the worst-case protective packaging. The rationale for identifying the worst-case sterile barrier system shall be established and documented.

113. Stability testing must all be performed to demonstrate that the sterile barrier system maintains integrity over time. Stability testing shall be performed using real-time aging.

114. At all times material as set forth in detail herein, for years Defendant Exactech failed to comply with these federal regulations, good manufacturing practices, and industry standards, directly and proximately causing Plaintiff Gamble's injuries.

115. At all times material as set forth in detail herein, for years Defendant Exactech knew its packaging could have a direct effect on the longevity of its Optetrak Device, as the packaging played a large part in reducing the risk of in vitro oxidation during the shelf-life period between the completion of the manufacturing process and implantation in the patient.

116. At all times material as set forth in detail herein, for years Defendant Exactech knew it was important to ensure the UHMWPE components of its Optetrak Device were stable from an oxidation standpoint throughout the Optetrak Device's shelf-life, which Defendant Exactech had determined to be 5 to 8 years.

117. The UHMWPE components of Defendant Exactech's Optetrak Device are not irradiation stable. The diffusion of oxygen into gamma sterilized UHMWPE that is not properly thermally treated and packaged will occur during the Optetrak Device's shelf life, prior to implantation in patients.

118.    Defendant Exactech claims in its Annual Reports that its components are inspected to ensure its specifications and standards are maintained:

> Our internal manufacturing, assembly, packaging and quality control operations are conducted at our principal offices in Gainesville, Florida.  Components received from suppliers, as well as those manufactured internally, are examined by our personnel throughout the process and prior to assembly or packaging to ensure that our specifications and standards are maintained.

119.    Defendant Exactech also repeatedly recognized the importance of quality control of its products in its Annual Reports:

> Quality is extremely important to us and our customers due to the serious and costly consequences of product failure.  Our quality certifications are critical to the marketing success of our goods and services.  If we fail to meet these standards, our reputation could be damaged, we could lose customers, and our revenue and results of operations could decline… Moreover, failure to comply with our internal standards may result in the FDA viewing our products as misbranded or adulterated and subject to voluntary or involuntary recall or seizure or other sanctions including criminal and civil penalties.

120. According to a November 2021 FDA Report following an eight-day inspection, Defendant Exactech had testing and procedures in place (Process Failure Modes and Effect Analysis/Packaging of Implants) that identified the associated consequences of the packaging process and the risk of exposure to oxidation.

121. In addition, in 2007, Defendant Exactech established a protocol, "PR-2006-043 Protocol for Shelf Life Testing (5 year, 6 year, 7 year, and 8 year Real Time and Accelerated Aging) of UHMWPE and Metal Products Packaged in PET/PE Film/Uncoated [redacted]" and a test report "TR-2007-042 Shelf Life Report – 8 Year Accelerated Aging of UHMWPE and Metal Products Packaged in PET/PE Film/Uncoated [Redacted]" to establish the testing required to demonstrate that the packaging configurations for products manufactured at Exactech would remain at an acceptable level of oxidation throughout a 5-year, 6-year, 7-year, and 8-year shelf life.

122. Defendant Exactech's protocol and report indicated that all of its "device implants manufactured with [redacted] are loaded into an [redacted] vacuum bag, which becomes in direct contact with the implants, and is intended to serve as an oxygen barrier." Also, "Acceptance criteria defined within the protocols encompassed package integrity testing for the inner and outer pouches and included leak testing [redacted] and seal strength [redacted]."

123. However, in the November 2021 inspection, FDA investigators found that "no acceptance criteria was established for the vacuum bags by means of related product testing activities, to ensure that oxidation was prevented within the packaging configuration." "Subsequently, acceptance activities were not implemented as part of routine production activities, to ensure the integrity of the vacuum bags and adherence pre-determined product design requirements."

124. In other words, Defendant Exactech knew of the associated consequences of vacuum sealing and oxidation, yet did no testing and implemented no quality control sampling during the lifetime of its Optetrak Device to ensure that oxidation was prevented.

125. Furthermore, the FDA investigators concluded that Defendant Exactech had "no documented evidence to substantiate that sample sizes employed as part of shelf-life study protocols were based on a valid statistical rationale."

126. Specifically, the samples that were tested for device density as part of "PR- 2006-043 Protocol for Shelf Life Testing (5 year, 6 year, 7 year, and 8 year Real Time and Accelerated Aging) of UHMWPE and Metal Products Packaged in PET/PE Film/Uncoated [redacted]" were inadequate and Defendant Exactech's sampling plans were not based on valid statistical rationale.

127. Despite the inadequate sample size and to deal with excess inventory, in approximately 2007, Defendant Exactech extended the shelf life of its Knee

Inserts from 5 years to 8 years and did not report this extended shelf life as a design or labeling change to the FDA.

128.   Defendant Exactech extended the shelf-life for its Knee Inserts despite knowledge that orthopedic manufacturers impose a shorter shelf life so that the product can be removed from the field/inventory before reaching oxidation thresholds that can compromise the integrity of the device.

129.   During the November 2021 FDA inspection, Defendant Exactech also disclosed to FDA investigators "that no process validation activities have been conducted since the manufacturing process was first implemented."  Accordingly, FDA investigators concluded "process validation activities have not been conducted for manufacturing processes intended to ensure product specifications to prevent device oxidation."

130.   The FDA investigators also concluded that "acceptance activities for in-coming components have not been adequately established."

131.   As a direct result of the FDA's inspection and findings of manufacturing defects, Defendant Exactech expanded its August 30, 2021 knee recalls in April 7, 2022, as described further below.

132.   Specifically, Defendant Exactech had packaging specifications in place that required the UHMWPE components of its Optetrak Device be packaged in

vacuum bags consisting of layers of low-density polyethylene, nylon, and an ethylene vinyl alcohol ("EVOH") barrier to protect against oxidation.

133. Without the EVOH layer, oxygen is transmitted to the UHMWPE and degrades the mechanical properties of the material.

134. Exactech purchased the vacuum bags that were intended to contain an EVOH layer from a local Florida supplier, Hillman Supply, Inc.

135. On its website, Hillman Supply describes itself as a "stocking distributor of janitorial products, packaging materials, personal protection items, facility, supplies, and much more." Hillman's website homepage features N95 masks, batteries, scotch tape, gloves, Clorox disinfecting wipes, Bounty paper towels, and toilet paper.

136. As described further below, in Defendant Exactech's February 7, 2022 recall, Defendant Exactech indicates that it discovered that Hillman provided the wrong packaging for seventeen years, and Defendant Exactech failed to recognize this deficiency for seventeen years in violation of its quality assurance and quality control operating procedures, leading to hundreds of thousands of Defendant Exactech's Optetrak Device being manufactured with improper packaging.

## V. **Marketing & Performance**

137. At all relevant times, Defendant Exactech marketed, sold, and distributed its Exactech Knee Device internationally and throughout the United States.

138. At all relevant times, Defendant Exactech was aware that the Optetrak Device had higher than anticipated revision rates when compared to its competitors, which required patients to undergo revision surgeries to remove or revise the defective devices.

139. Defendant Exactech touted the Optetrak Device as being first-in-class in their product brochures.

140. Defendant Exactech utilized, among other things, on-line and other brochures and on-line videos of Defendant Exactech "team surgeons," to market and sell its Optetrak Device.

141. Defendant Exactech distributes and otherwise directly provides Orthopedic Surgeons instructions for use (IFU) and instructions for implantation of the Optetrak Device.

142. As stated in Defendant Exactech's promotional materials, while the design of its Optetrak Device has evolved over time, "the [polyethylene] materials have been consistent."

143. Defendant Exactech represented to surgeons that its UHMWPE tibial inserts are designed to resist oxidation, reduce wear, and improve longevity of the knee prosthesis.

144. Defendant Exactech represented to surgeons that its UHMWPE tibial inserts have "a long clinical history of excellent wear characteristics."

145. Defendant Exactech represented to surgeons that "Exactech's comprehensive knee systems address your concerns for contact stress, patellar tracking, polyethylene wear, joint stability and bone preservation . . ." and "are designed with a singular purpose: to improve patient outcomes."

146. In Defendant Exactech's 2011 Optetrak Logic Design Rationale marketing brochure, it promised that, "[i]n clinical and laboratory data, the Optetrak Logic implants demonstrate excellent long-term clinical outcomes" and "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

147. Defendant Exactech promoted their Optetrak Device as a system with nearly three decades of clinical success and proven outcomes for patients around the world because of an improved articular design resulting in low polyethylene stresses.

148. Defendant Exactech represented to surgeons that the Optetrak knee system had "excellent long-term clinical performance with 98% survival rates."

149. Defendant Exactech utilized paid consultants and/or members of its design teams to champion its devices

150. At all times material hereto, Defendant Exactech knew the representations being made by its product champions, which were cleared and authorized by Defendant Exactech, were untrue or misrepresented the actual clinical performance of the Optetrak Device to the detriment of patients.

151. Defendant Exactech repeatedly endeavored to squelch concerns by surgeons as to polyethylene failures and would have Dr. William Petty, an orthopedic surgeon and original founder of Defendant Exactech, or Gary Miller, Executive Vice President of Research and Development, visit with any concerned surgeon or fly the surgeons to their Gainesville headquarters for meetings with the founders and executives to reassure them of the safety of the product and affirmatively discourage the publication of any critical information or medical literature.

152. On repeated occasions, different surgeons complained to Defendant Exactech of premature revisions and Defendant Exactech falsely claimed that their experience was an anomaly not experienced by other surgeons in an effort to dissuade them from challenging the safety of the Optetrak Device and raising insecurity amongst such surgeons that the problem was their patient population or technique and certainly not with the Optetrak Device.

153. In Defendant Exactech's 2011 Optetrak Logic Design Rationale marketing brochure, in promoting the Optetrak Device as part of a continuously improving evolution of knee-replacement devices, it warranted that the Optetrak Device's predecessor, the I/B knee design is a "prosthesis that is likely to outlive the patients."

154. In 2010, Defendant Exactech's Optetrak Main Brochure specifically warrants that its Optetrak net compression molded polyethylene "retains all of its mechanical properties (yield strength, fatigue strength, and fracture resistance), avoiding the generation of free radicals."

155. The 2011 Optetrak Logic Design Rationale marketing brochure further justified and warranted its manufacturing process claiming:

> Since the Optetrak tibial locking mechanism is proven to resist
> micromotion and abrasive backside wear, a high level of cross-linking
> is not necessary. By avoiding a high level of cross-linking, Optetrak
> Logic's NCM polyethylene tibial inserts retain oxidation resistance
> and fracture toughness, which, when combined with the articular
> design, has demonstrated excellent wear resistance on both the topside
> and backside.

156. The 2010 Optetrak Main Brochure also touted that its Optetrak net compression molded polyethylene tibial inserts "demonstrated an 83 percent

reduction in wear rate [] and 52 percent less damaged area [] than the I/B [Insall/Burstein) II machined tibial inserts."

157.   The 2010 Optetrak Main Brochure also promoted the "solid results" of its polyethylene inserts warranting: "Recent studies documenting the backside wear of polyethylene inserts call into question the stability of locking mechanisms in some modular tibial components. In contrast, indicators on Optetrak inserts substantiate its locking mechanism's ability to reduce backside wear." "Retrieved Optetrak insert demonstrates minimal wear with no measurable material loss."

158.   In recognizing knee components "dominant wear mechanisms are delamination and pitting (highly affected by fracture toughness)," Defendant Exactech said its knee insert components are "made with Exactech's proprietary net compression molding technology do not require high levels of radiation cross linking and the subsequent post-processing treatments to create the preferred performance properties for knee applications."

159.   Defendant Exactech further warrants: "All of the articular surfaces of Exactech tibial polyethylene inserts are carefully molded into the part and not machined as in other processes. By the nature of this proprietary, net compression molding consolidation process, the inserts have high fatigue strength, high fracture toughness, low wear rates and are much less sensitive to oxidation after sterilization."

160.   Defendant Exactech compares its wear rates to competitors and states: "Comparative laboratory testing published by various manufacturers and researchers shows that Exactech's net compression molded polyethylene has demonstrated approximately 6X less wear than extruded UHMWPE. This is achieved without sacrificing other important mechanical properties."

161.   In 2008, Defendant Exactech's Optetrak Main Brochure represented that the Optetrak Device provides longevity, warranting the Device's long-term clinical success: "The rate of reoperation for any reason was extremely low (1 percent). No re-operations were required for either design-related problems, component fault or failure, patellar or tibial-femoral instability, for insufficient motion or for repair or release of collateral or posterior soft tissue."  In the 2010 Optetrak Main Brochure, the rate of reoperation was amended to 1.4 percent.

162.   However, these statements are based on a survival rate study conducted by paid Exactech consultant and device champion Dr. Raymond P. Robinson, who limited the study exclusively to the survival rate of the Exactech Optetrak Posterior Stabilized knee.  Dr. Robinson's 2005 study is based on a sample of 66 knee replacements in 47 patients that were implanted between April 27, 1996 and November 11, 1996.

163. In the 2011 Optetrak Logic Design Rationale Brochure and 2015 Optetrak Logic Comprehensive Knee System Brochure, Defendant Exactech further warrants:

> In a peer-reviewed study, led by Raymond Robinson, MD, Optetrak demonstrated 98 percent implant survival rates in patients followed up to 15 years with a mean follow-up of 11.5. In a study led by Ivan Gradisar MD, the Optetrak knee system showed a 98.6 percent implant survival rate at 8.5 years. (Figure 2). With a design evolving for more than three decades and demonstrating excellent clinical and laboratory results, surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system.

164. The 98.6% figure for Dr. Gradisar – a paid Exactech consultant and device champion – is based on an unpublished, non-peer-reviewed presentation by Dr. Gradisar which was made in 2004. The brochures were also not updated to reflect Dr. Gradisar's findings in his 2008 audit that revealed 24 Optetrak knee revision surgeries that occurred from January 1, 2007 to March 2008 in just one hospital. Instead of recording each of these internally reported 24 revision surgeries, Defendant Exactech only attributed one revision surgery to Dr. Gradisar in 2008.

165. Defendant Exactech's marketing information about the Exactech Optetrak Logic PS tibial inserts boasts exceptional UHMWPE wear performance but cites Optetrak PS data.

166. A 2014 internal memorandum titled "Exactech Knee Sales Problems," authored by David Petty, Defendant Exactech's Executive Vice President of Sales and Marketing from February 2000 until December 2007, President from 2007 until 2014, and the CEO from 2014 until January 2020, revealed that one of Exactech's "tibial components was very sensitive to cementation technique and in some instances we had unacceptable rates of tibial loosening (meaning the component loses its fixation within the bone and the patient must have a revision procedure)."

167. Defendant Exactech never updated its marketing materials to disclose the truth expressed by David Petty.

168. In 2020, Defendant Exactech's Knee Design Rationale Brochure continued to use misleading and decades old data, citing the reoperative rates of 1.4 and 2% by Dr. Gradisar and Dr. Robinson to tout the clinical results of its knee systems.

a. **Clinical Studies**

169. At all relevant times, Defendant Exactech's marketing materials omit the findings of higher revision rates in independent peer reviewed studies.

170. In 2010, researchers presented an article in France that was later published in 2012 showing that the Exactech Optetrak system had a "cumulated" survival rate of 80.97 ± 9.1% at 36 months and 76.74 ± 12% at 45 months. Such a high revision rate is generally recognized as very unacceptable.

171. Defendant Exactech's Bill Petty, Gary Miller, and Dr. Albert Burstein responded with accusations that "the authors produce[d] a biased conclusion that will mislead readers."

**b.      Implant Registeries**

172. Defendant Exactech's Optetrak Device has performed poorly when compared to its competitors.

173. The Australian Orthopaedic Association National Joint Replacement Registry, a preeminent, internationally recognized resource for evaluating orthopedic implants, identified the Optetrak Posterior Stabilized (PS) Knee System as an implant with a higher-than-expected rate of revision in their 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, and 2021 annual reports.

174. In 2013, the Australian Joint Registry annual report determined that the Optetrak PS had a cumulative revision rate of 13.5% at 3 years and 17.4% at 5 years. In 2014, it determined that the Optetrak PS had a cumulative revision rate of 19.4% at 7 years. In 2016, it determined that the Optetrak PS had a cumulative revision

rate of 22% at ten years. These failure rates demonstrated statistically significant increased revision rates compared to other total knee arthroplasty systems and far exceeds international guidelines for accepted revision rates.

175. From 2007 to 2021, Defendant Exactech's marketing materials never disclosed that the Australian joint registry determined that the Optetrak PS had the worst failure rate of any implant on the Australian market - information that was known to Defendant Exactech.

176. The United Kingdom National Joint Registry, another preeminent, internationally recognized resource for evaluating orthopedic implants, identified the Optetrak Knee System as an implant with statistically significant increased cumulative revision rates compared to all total knee arthroplasty systems in their 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, and 2021 annual reports. These failure rates far exceeds international guidelines for accepted revision rates.

177. From 2013 to 2021, Defendant Exactech's marketing materials never disclosed that the United Kingdom joint registry determined that the Optetrak Knee System had the worst failure rate of any implant on the United Kingdom market - information that was known to Defendant Exactech.

178. The New Zealand Orthopaedics Association Joint Registry, yet another preeminent, internationally recognized resource for evaluating orthopedic implants, identified the Optetrak Knee System as an implant with significantly higher revision

rates compared to all other primary total knee arthroplasty systems in their 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, and 2021 annual reports. As of 2012, 21 knees had been revised among 614 Optetrak primary total knee arthroplasties for a revision rate of 0.981/100 component years compared to the revision rate of 0.51/100 component years for all other primary total knee arthroplasty systems. As of 2013, 28 knees had been revised among 646 Optetrak primary total knee arthroplasties for a revision rate of 1.01/100 component years compared to the revision rate of 0.50/100 component years for all other primary total knee arthroplasty systems and represented a statistically significant value greater than a two-fold increased revision rate. As of 2021, 67 knees had been revised among 661 Optetrak primary total knee arthroplasties for a revision rate of 1.017/100 component years compared to the revision rate of 0.47/100 component years for all other primary total knee arthroplasty systems.

179. From 2012 to 2021, Defendant Exactech's marketing materials never disclosed that the New Zealand joint registry determined that the Optetrak Knee System had significantly higher revision rates compared to all other primary total knee arthroplasty systems on the New Zealand market - information that was known to Defendant Exactech.

180. Defendant Exactech only disclosed these Registry failure rates in it's February 7, 2022 recall, discussed further below.

c.      **MAUDE Reports**

181.   Defendant Exactech had further earlier clinical evidence that its Optetrak Device was failing at a rate higher than promoted. The FDA's Manufacturer and User Facility Device Experience ("MAUDE") database records complaints submitted to the FDA by mandatory reporters, including manufacturers, importers and device user facilities, and voluntary reporters such as health care professionals, patients and consumers.

182.   By 2012, reports in the MAUDE database indicate instances of revision due to "loose tibial component," "aseptic loosening," "pain and visible loosening," "polyethylene deformation," "polyethylene worn," and "pain, limited mobility, knee swelling and sensitivity" due to "loose" joint.

183.   In 2013, complaints in the MAUDE database continued to be reported indicating instances of revision due to "tibial loosening" just two years postoperatively, "revision due to tibial loosening," "during revision, the tibial component was found to be loose and easily removed," "revision of knee component due to loosening," and "revision due to pain and loosening."

184.   In 2014, complaints in the MAUDE database continued to be reported indicating instances of revision due to "revision due to tibial loosening," "tibial loosening," "revision of optetrak knee components due to tibial loosening," "revision due to pain and loosening," "revision of optetrak knee components due to

aseptic loosening," several reports described as "revision of knee components due to tibial loosening," and "revision of optetrak knee components reportedly due [to] aseptic loosening."

185. To date, there are over 500 reports in the MAUDE database related to problems with Defendant Exactech's Optetrak Device.

186. The general practice in orthopedic implant surgeries generally, and with Defendant Exactech's implants specifically, is for the sale representative of the manufacturer, in this case Defendant Exactech's authorized representative and agent, hereinafter "the sales rep," to be present at the time of surgery to provide implant components to the surgeon, relieving the hospital of the responsibility for having on stock all potential sizes and components that may be needed in surgeries. This practice includes the original implant surgery and any revision surgery.

187. The sales reps of Defendant Exactech observed many instances of premature failures of the Optetrak Device with plain evidence upon revision of polyethylene debris that needed to get removed, a/k/a "debrided," visible bone loss or osteolysis and plainly loose components that were easy to remove due to lack of fixation. Often these sales reps would take the component from the surgeon to return to the company for inspection and analysis.

188. The sales reps of Defendant Exactech were under a duty to report these findings to the engineering and medical departments of Defendant Exactech who

were under a duty to then do an investigation, analyze the removed component when available, also known as "retrieval analysis" and honestly and thoroughly report such findings to the FDA and the surgeons.

189.    Despite Defendant Exactech's knowledge of early onset failures of the Optetrak Device, Defendant Exactech continued to manufacture, promote, and distribute the Optetrak Device without alerting surgeons, patients or the FDA of the potential increased risks of early onset failures of the Optetrak Device.

190.    Defendant Exactech never changed the labeling, marketing materials or product inserts to adequately and accurately warn patients or physicians of the associated increased risks of early failure due to loosening and/or polyethylene wear.

191.    Defendant Exactech's marketing materials were never updated to reflect the complaints, revisions, and adverse events reported to Defendant Exactech by physicians, Exactech sales representatives, and other members of the medical community.

192.    As discussed in further detail below, it was not until Defendant Exactech was forced to recall its Optetrak Device in 2021 due to defective packaging that Defendant Exactech disclosed to surgeons and patients the true scope of the risks associated with its Optetrak Device.

193.    As discussed in further detail below, in a letter accompanying Defendant Exactech's 2022 Recall of its Optetrak Device, Defendant Exactech

admitted "the original Optetrak Knee system, introduced in 1992, has shown statistically significant higher overall revision rates as compared to other TKAs in the Australian, United Kingdom and New Zealand Registries."

194. Defendant Exactech further admitted that "[e]very Exactech Optetrak TKR polyethylene component combination demonstrated statistically significant increased revision rates compared to other TKR systems." Defendant Exactech then cited to "statistically significant increased cumulative revision rates" in the United Kingdom Registry and the New Zealand Registry.

195. Defendant Exactech also admitted the reasons for revision potentially associated with polyethylene wear (e.g., loosening, lysis, pain) were increased three- to seven-fold in the most used Exactech Optetrak combination (Optetrak-PS/Optetrak) when compared to other TKRs in the Australian Registry. Defendant Exactech went on to admit that it had failed to properly package its Optetrak Device since 2004 and that failure may be related to the increased revision diagnoses related to accelerated polyethylene wear.

196. Despite knowledge of high revision rates associated with its Optetrak Device, Defendant Exactech failed to update its marketing materials for at least twelve years (between 2008-2020) and, until its February 7, 2022 Recall, continued to provide the same false and misleading survival and revision rates mentioned above.

197.  At all times material hereto, Defendant Exactech falsely conflated the survival and revision rates of the Optetrak line of devices as one device, when in fact it was based on limited, outdated, and inaccurate information.

198.  Despite knowledge of high revision rates in its Optetrak Device, Defendant Exactech continued to sell these products for implantation and disseminate false, misleading, and inaccurate marketing materials to Plaintiffs including Plaintiff Gamble, their physicians, and the medical community.

199.  Despite having knowledge of the early onset failures of its Optetrak Device, Defendant Exactech continued to manufacture, promote, sell, supply, and distribute the defective Optetrak Device without alerting surgeons of the potential risks associated with such and continued to supply them with the false survival rate information contained in their marketing materials.

## VI.  **Recall**

200.  On or about August 30, 2021, Defendant Exactech issued a partial recall of the "Optetrak Comprehensive Knee System."

201.  The August 2021 Partial Knee Recall states only that polyethylene "inserts were packaged in vacuum bags that lacked an additional oxygen barrier layer."

202.  Based on information provided by Defendant Exactech, on October 4, 2021, the FDA published the following on its Recall website:

Manufacturer Reason for Recall: Inserts were packaged in vacuum bags that lacked an additional oxygen barrier layer.

FDA Determined Cause: Process Control

Action: Exactech notified distributors and sales representatives on about 08/30/2021 via letter titled" URGENT MEDICAL DEVICE RECALL." Actions included removing all Knee and Ankle UHMWPE products labeled with an 8-year shelf life and not packaged in EVOH/Nylon bags, in a phased approach over 12 months. Phase 1: immediately return all knee and ankle UHMWPE devices labeled with an 8-year shelf life that will be 5 years old or older by 08/31/2022 not packaged in EVOH/Nylon bags. Phase 2: between 05/31/2022 to 08/31/2022, returning all remaining knee and ankle UHMWPE devices labeled with an 8-year shelf life not packaged in EVOH/Nylon bags. A communication to healthcare professionals should follow.

203. Critically, Defendant Exactech did not send notification of this August 2021 Partial Knee Recall to medical providers or patients. Instead, Defendant Exactech chose to direct this Recall to its distributors and sales representatives.

204. On September 15, 2021, Defendant Exactech issued an "Urgent Field Safety Notice Medical Device Recall" to "Exactech Agents, Representatives, and Distributors in Possession of Affected Products."

205. The September 2021 Field Safety Notice indicated:

Description of Issue: Exactech is recalling Exactech Knee and Ankle Ultra-High Molecular Weight Polyethylene (UHMWPE) inserts labeled with an 8-year shelf life. These inserts were packaged in vacuum bags that did contain a nylon barrier, which does substantially limit oxygen transmission, but did not contain an additional oxygen barrier layer consisting of Ethylene Vinyl Alcohol (EVOH) as specified on the packaging drawing.

Use of vacuum bags without an EVOH layer may result in elevated transmission of oxygen to the UHMWPE insert packaged therein which can potentially result in increased oxidation of the material relative to inserts packaged with EVOH over time.

As of August 5, 2021, all products manufactured by Exactech are being packaged in EVOH vacuum bags to ensure adequate oxygen barrier properties and protection from oxidation of polyethylene inserts throughout the 8-year shelf life.

206. Describing the "Clinical Impact" of the product defects addressed in the recall, Defendant Exactech acknowledged that "[e]xposure to oxygen over time can allow oxidation of the UHMWPE implant leading to a reduction of mechanical properties, which may ultimately require revision of the implant (UHMWPE Component)."

207. As with the August 30, 2021 Recall, Defendant Exactech failed to send any similar notification to medical providers or patients.

208. As discussed above, in November 2021, the FDA sent investigators to Defendant Exactech and following an eight-day inspection they found multiple CGMP quality system violations and cited Defendant Exactech for:

    a.    Lack of or inadequate procedures for purchasing controls in violation of 21 C.F.R. § 820.50 – procedures to ensure that all purchased or otherwise received product and services conform to specified requirements have not been adequately established;

    b.    Lack of or inadequate procedures for design transfer in violation of 21 C.F.R. §820.30(h) – procedures for design transfer have not been adequately established;

    c.    Lack of or inadequate procedures for design validation in violation of 21 C.F.R. § 820.30(g) – procedures for design validation have not been adequately established;

    d.    Lack of or inadequate procedures for design validation in violation of 21 C.F.R. § 820.30(g) – risk analysis is incomplete; and

    e.    Lack of or inadequate design verification procedures in violation of 21 C.F.R. § 820.30(f).

209.    All of these violations stem from manufacturing defects related to Defendant Exactech's packaging and shelf-life of products with UHMWPE.

210.    As a result of the FDA's findings, about five months later on, February 7, 2022, Defendant Exactech issued an URGENT MEDICAL DEVICE CORRECTION to "Exactech Knee and Ankle Surgeons, Hospitals, Healthcare Professionals" advising the healthcare professionals of the product defect, recall, and its clinical significance and expanding the August 31, 2021 recall to include "all knee and ankle arthroplasty polyethylene inserts packaged in non-conforming bags regardless of label or shelf life."

211.    Defendant Exactech further advised that most of its inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "non-conforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol ("EVOH") that further augments oxygen resistance. The clinical significance was described as follows:

The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery.

212. This February 7, 2022 communication was the first time Defendant Exactech directly notified healthcare providers about any problem with its UHMWPE inserts.

213. Notably, Defendant Exactech did not inform healthcare providers that for seventeen years it had failed to ever inspect the bags to ensure they complied with design specifications and that no process validation activities had been conducted since the manufacturing process was first implemented.

214. Defendant Exactech has acknowledged the UHMWPE material has remained consistent and that the defect is applicable to all generations of its Optetrak Device, including the polyethylene inserts used therein.

215. During their market tenure all generations of its Optetrak Device have been packaged in non-conforming bags, i.e., not packaged in EVOH/Nylon bags.

216. At all relevant times, Defendant Exactech knew or should have known that the UHMWPE components of the Optetrak Device were improperly packaged.

217. The packaging method, process, and requirements for the polyethylene components of the Optetrak Device are an integral part of Defendant Exactech's manufacturing process.

218. Defendant Exactech knew that if its packaging lacked an EVOH barrier, oxygen would diffuse into the gamma sterilized UHMWPE inserts, the oxygen would react with free radicals created and not properly addressed by thermal treatments in the manufacturing process, and this oxygen exposure and reaction would result in high rates of oxidation and embrittlement of the UHMWPE inserts.

219. In fact, Defendant Exactech admits the accelerated wear and failure of its Optetrak Device is due to the improper, out of specification packaging of the polyethylene component, which exposes the part to oxygen, causing advanced oxidation and deterioration at an accelerated rate. This leads to premature failure of the Optetrak Device.

220. This problem was made worse by Defendant Exactech failing to determine the proper shelf life for its UHMWPE inserts.

221. This improper shelf-life, coupled with the failure to barrier package the devices to prevent oxidation, greatly increased the risk of oxidation and embrittlement of the UHMWPE of the Optetrak Device.

222. As a direct result of Defendant Exactech's use of moderately crosslinked polyethylene, failure to properly heat treat the UHMWPE during manufacturing, failure to properly package the devices, and/or the failure to have an appropriate expiration date, the Optetrak Device experiences accelerated wear, delamination, and fails more readily and often than other total knee arthroplasty devices on the market.

223. Had Defendant Exactech properly tested, investigated, and/or had appropriate quality systems in place, Plaintiff Gamble would have been spared debilitating injuries and unnecessary surgeries due to wear debris and delamination from the UHMWPE inserts' use in situ.

224. As set forth above, the Optetrak Device is adulterated and misbranded and subject to recall due to accelerated wear of the UHMWPE inserts.

225. Because of Defendant Exactech's tortious acts and omission, including but not limited to its negligence in design and manufacture, including packaging, of its Optetrak Device inserts, Plaintiff Gamble, implanted with the Optetrak Device has had to undergo and will lilkely have to undergo another significant revision surgery to remove and replace the defective Optetrak Device.

226. Plaintiff Gamble has suffered significant and continuing pain and personal injuries as well as substantial medical bills and expenses.

## C. Allegations

## Count I – Negligent Manufacture of a Defective Product

227. The preceding paragraphs are incorporated by reference herein.

228. At all times relevant to this action, Defendant Exactech designed, developed, tested, licensed, manufactured, assembled, packaged, labeled, prepared, marketed, distributed, sold, supplied, and introduced into interstate commerce the components of the defective Optetrak Device.

229. At all times material hereto, Defendant Exactech owed a duty to Plaintiff Gamble and any users of the Optetrak Device to exercise reasonable care, skill, and diligence of an ordinarily prudent manufacturer in making the Optetrak Device to insure it was fit for its intended purpose.

230. The manufacturing of the Optetrak Device was not reasonably fit for its intended purpose of providing a replacement knee. The manufacturing process of the Optetrak Device created a risk of harm that was so probable that an ordinarily prudent manufacturer would have pursued a different available manufacturing process that would substantially lessen the probability of harm.

231. The failure of Defendant Exactech's Optetrak Device that was placed in the Left Knee of Plaintiff Gamble on or about March 17, 2016 was the direct and

proximate result of the negligence, carelessness and recklessness of Defendant Exactech in the following particulars:

      a.    failing to properly package the polyethylene components of the Optetrak Device;

      b.    The vacuum bags used to package the polyethylene components of the Optetrak Device failed to comply with Defendant Exactech's specifications in that they lacked a secondary barrier layer containing ethylene vinyl alcohol (EVOH) to prevent the components from undergoing increased oxidation;

      c.    failing to select appropriate third-parties to supply packaging for the polyethylene components used in the Optetrak Device;

      d.    failing to properly supervise and monitor the packaging of the polyethylene components used in the Optetrak Device;

      e.    failing to properly and thoroughly select the material that would be used in the packaging of the Optetrak Device;

      f.    The materials used to package the Optetrak Device were of an inferior grade or quality;

      g.    failing to properly and thoroughly select the materials that would be used in the Optetrak Device, including failing to select highly-crosslinked polyethylene and polyethylene that contains Vitamin E;

h.     The polyethylene components of the Optetrak Device were degraded/deteriorated prior to implantation as a result of factors that include but are not limited to: (1) storage in vacuum bags that lacked a secondary oxygen barrier containing EVOH; (2) storage in packaging of inferior quality; (3) storage in facilities with inadequate environmental controls; (4) inadequate quality control, process validation, and inspection and correction of non-conformities; (5) inadequate inventory control, testing, inspection, and rotation; (6) inadequate procedures for receiving, documenting, reviewing, evaluating, and inspecting product complaints; and (7) improper and unreasonably long and thus unsafe shelf-life designations.

i.     failing to properly and adequately test the Optetrak Device and their attendant parts before releasing the Optetrak Device to market;

j.     failing to conduct sufficient post-market testing and surveillance of the Optetrak Device;

k.     failing to adequately prevent, identify, mitigate, and fix defective designs and hazards associated with the Optetrak Device in accordance with good manufacturing practices;

l.     continuing to negligently manufacture and distribute the Optetrak Device after Defendant Exactech knew or should have known of their adverse effects and/or increased early onset failure rates;

m.      misrepresenting the safety of the Optetrak Device;

n.      failing to warn consumers, doctors, users, and patients that the Optetrak Device would contain polyethylene materials not properly packaged and/or in accordance with Defendant Exactech's specifications;

o.      failing to provide pre and post-sale warnings, instructions, or other information that accurately reflected the risks of accelerated polyethylene wear, Optetrak Device failure rates, and revision surgery associated with the Optetrak Device;

p.      failing to provide pre and post-sale warnings, instructions, or other information that would allow patients and surgeons' to mitigate the harm caused by polyethylene degradation and the failure of the Optetrak Device;

q.      failing to exercise due care in the advertisement and promotion of the Optetrak Device;

r.      disseminating information that was inaccurate, false, and misleading which failed to communicate accurately or adequately the high early failure rate associated with the implantation of the Optetrak Device;

s.      aggressively promoting the Optetrak Device without proper warnings of the risk of early failure or material degradation in the average user;

t.     aggressively promoting the Optetrak Device even after Defendant Exactech knew or should have known of the unreasonable risks from implantation;

u.     diminishing or hiding the risks associated with the implantation of the Optetrak Device;

v.     failing to recall the Optetrak Device at an earlier date;

w.     failing to have a protocol for its sales representatives to retain explanted devices for retrieval analysis;

x.     failing to thoroughly and accurately report revisions to the FDA;

y.     violating applicable state and federal laws and regulations; and

z.     in other respects to be proved at trial.

232.   Despite the fact that Defendant Exactech knew or should have known that the Optetrak Device was defective, had abnormally high rates of early failure, and was causing serious complications in patients, Defendant Exactech continued to manufacture, promote, market, defend, and promote the Optetrak Device when safer knee implants were available.

233.   Had they exercised reasonable care, Defendant Exactech would or should have been in possession of evidence demonstrating that the Optetrak Device was defective, had abnormally high rates of early failure, and was causing serious complications in patients during normal foreseeable use.

234.   Nevertheless, Defendant Exactech continued to manufacture, market, and sell the Optetrak Device and actively concealed the problems by providing false and misleading information with regard to its safety.

235.   Defendant Exactech failed to warn doctors and patients of unacceptable risks presented by the Optetrak Device.

236.   Defendant Exactech had legal and moral obligations to stop manufacturing, promoting, marketing, selling and defending the Optetrak Device. Defendant Exactech should have instead notified physicians who had implanted the Optetrak Device of the device's propensity to fail, and for some patients to develop extremely adverse reactions to the deterioration of the polyethylene components generated by normal use of the device. Defendant Exactech should have attempted to convey this same information to patients who had been implanted with the Optetrak Device.

237.   Defendant Exactech knew or should have known that consumers such as Plaintiff Gamble would foreseeably suffer injury as a result of their failure to exercise ordinary care as described above.

238.   No negligence on the part of the Plaintiff Gamble contributed to the happening of the occurrence.

239. Plaintiff Gamble's injuries and damages as recited herein, occurred directly as a result of and were proximately caused by the negligence, carelessness, and recklessness of the defendant as described herein.

240. As a direct and proximate result of receiving Defendant Exactech's Optetrak Device, Plaintiff Gamble suffered serious injuries to her Left Knee and body, required medical care and attention, including additional surgery, need for future revision surgery of the Right Knee, additional hospital admission, additional physical therapy, suffered mental anguish, pain and agony as a result of the happening of the occurrence and was otherwise injured and damaged, for which claim is made.

## Count II – Negligent Product Design

241. The preceding paragraphs are incorporated by reference herein.

242. At all times relevant to this action, Defendant Exactech designed, developed, tested, licensed, manufactured, assembled, packaged, labeled, prepared, marketed, distributed, sold, supplied, and introduced into interstate commerce the components of the defective Optetrak Device.

243. At all times material hereto, Defendant Exactech owed a duty to Plaintiff Gamble and any users of the Optetrak Device to exercise reasonable care, skill, and diligence of an ordinarily prudent manufacturer in designing the Optetrak Device so as to minimize all foreseeable risks of harm.

244. The Optetrak Device was not reasonably designed for its intended purpose of providing a replacement knee. The design created a risk of harm that was so probable that an ordinarily prudent manufacturer would have pursued a different available design that would substantially lessen the probability of harm.

245. The failure of Defendant Exactech's Optetrak Device that was placed in the Left Knee of Plaintiff Gamble on or about March 17, 2016 was the direct and proximate result of the negligence, carelessness and recklessness of Defendant Exactech in the following particulars:

a. failing to properly package the polyethylene components of the Optetrak Device;

b. The vacuum bags used to package the polyethylene components of the Optetrak Device failed to comply with Defendant Exactech's specifications in that they lacked a secondary barrier layer containing ethylene vinyl alcohol (EVOH) to prevent the components from undergoing increased oxidation;

c. failing to select appropriate third-parties to supply packaging for the polyethylene components used in the Optetrak Device;

d. failing to properly supervise and monitor the packaging of the polyethylene components used in the Optetrak Device;

e. failing to properly and thoroughly select the material that would be used in the packaging of the Optetrak Device;

f.      The materials used to package the Optetrak Device were of an inferior grade or quality;

g.      failing to properly and thoroughly select the materials that would be used in the Optetrak Device, including failing to select highly-crosslinked polyethylene and polyethylene that contains Vitamin E;

h.      The polyethylene components of the Optetrak Device were degraded/deteriorated prior to implantation as a result of factors that include but are not limited to: (1) storage in vacuum bags that lacked a secondary oxygen barrier containing EVOH; (2) storage in packaging of inferior quality; (3) storage in facilities with inadequate environmental controls; (4) inadequate quality control, process validation, and inspection and correction of non-conformities; (5) inadequate inventory control, testing, inspection, and rotation; (6) inadequate procedures for receiving, documenting, reviewing, evaluating, and inspecting product complaints; and (7) improper and unreasonably long and thus unsafe shelf-life designations.

i.      failing to properly and adequately test the Optetrak Device and their attendant parts before releasing the Optetrak Device to market;

j.      failing to conduct sufficient post-market testing and surveillance of the Optetrak Device;

k.      failing to adequately prevent, identify, mitigate, and fix defective designs and hazards associated with the Optetrak Device in accordance with good manufacturing practices;

l.      continuing to negligently manufacture and distribute the Optetrak Device after Defendant Exactech knew or should have known of their adverse effects and/or increased early onset failure rates;

m.      misrepresenting the safety of the Optetrak Device;

n.      failing to warn consumers, doctors, users, and patients that the Optetrak Device would contain polyethylene materials not properly packaged and/or in accordance with Defendant Exactech's specifications;

o.      failing to provide pre and post-sale warnings, instructions, or other information that accurately reflected the risks of accelerated polyethylene wear, Optetrak Device failure rates, and revision surgery associated with the Optetrak Device;

p.      failing to provide pre and post-sale warnings, instructions, or other information that would allow patients and surgeons' to mitigate the harm caused by polyethylene degradation and the failure of the Optetrak Device;

q.      failing to exercise due care in the advertisement and promotion of the Optetrak Device;

r.    disseminating information that was inaccurate, false, and misleading which failed to communicate accurately or adequately the high early failure rate associated with the implantation of the Optetrak Device;

s.    aggressively promoting the Optetrak Device without proper warnings of the risk of early failure or material degradation in the average user;

t.    aggressively promoting the Optetrak Device even after Defendant Exactech knew or should have known of the unreasonable risks from implantation;

u.    diminishing or hiding the risks associated with the implantation of the Optetrak Device;

v.    failing to recall the Optetrak Device at an earlier date;

w.    failing to have a protocol for its sales representatives to retain explanted devices for retrieval analysis;

x.    failing to thoroughly and accurately report revisions to the FDA;

y.    violating applicable state and federal laws and regulations; and

z.    in other respects to be proved at trial.

246.    Despite the fact that Defendant Exactech knew or should have known that the Optetrak Device design was defective, unsafe, had abnormally high rates of early failure, and was causing serious complications in patients, Defendant Exactech

continued to manufacture, promote, market, defend, and promote the Optetrak Device when safer knee implants were available.

247. Had they exercised reasonable care, Defendant Exactech would or should have been in possession of evidence demonstrating that the Optetrak Device design was defective, unsafe, had abnormally high rates of early failure, and was causing serious complications in patients during normal foreseeable use.

248. Nevertheless, Defendant Exactech continued to manufacture, market, and sell the Optetrak Device and actively concealed the problems by providing false and misleading information with regard to its safety.

249. Defendant Exactech failed to warn doctors and patients of unacceptable risks presented by the Optetrak Device.

250. Defendant Exactech had legal and moral obligations to stop manufacturing, promoting, marketing, selling and defending the Optetrak Device. Defendant Exactech should have instead notified physicians who had implanted the Optetrak Device of the device's propensity to fail, and for some patients to develop extremely adverse reactions to the deterioration of the polyethylene components generated by normal use of the device. Defendant Exactech should have attempted to convey this same information to patients who had been implanted with the Optetrak Device.

251. Defendant Exactech knew or should have known that consumers such as Plaintiff Gamble would foreseeably suffer injury as a result of their failure to exercise ordinary care as described above.

252. No negligence on the part of the Plaintiff Gamble contributed to the happening of the occurrence.

253. Plaintiff Gamble's injuries and damages as recited herein, occurred directly as a result of and were proximately caused by the negligence, carelessness, and recklessness of the defendant as described herein.

254. As a direct and proximate result of receiving Defendant Exactech's Optetrak Device, Plaintiff Gamble suffered serious injuries to her Left Knee and body, required medical care and attention, including additional surgery, need for future revision surgery of the Right Knee, additional hospital admission, additional physical therapy, suffered mental anguish, pain and agony as a result of the happening of the occurrence and was otherwise injured and damaged, for which claim is made.

## Count III – Breach of Duty to Warn

255. The preceding paragraphs are incorporated by reference herein.

256. At all times relevant to this action, Defendant Exactech designed, developed, tested, licensed, manufactured, assembled, packaged, labeled, prepared,

marketed, distributed, sold, supplied, and introduced into interstate commerce the components of the defective Optetrak Device.

257.   At all times material hereto, Defendant Exactech owed a duty to Plaintiff Gamble and any users of the Optetrak Device to warn about the risks of the Optetrak Device when it knew, or should have known, that the Optetrak Device involved a risk of harm when used for the purpose supplied.

258.   Defendant Exactech breached its duty to warn Plaintiff Gamble and any users that the Optetrak Device involved risks of abnormally high rates of early failure and serious complications when used for the purpose supplied.

259.   Defendant Exactech failed to exercise reasonable care, skill, and diligence of an ordinarily prudent manufacturer in warning consumers of the risks of the Optetrak Device including the propensity of the Optetrak Device to undergo substantial accelerated polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

260.   Nevertheless, Defendant Exactech continued to manufacture, market, and sell the Optetrak Device and actively concealed the problems by providing false and misleading information with regard to its safety.

261.   Defendant Exactech failed to warn doctors and patients of unacceptable risks presented by the Optetrak Device.

262. Defendant Exactech had legal and moral obligations to stop manufacturing, promoting, marketing, selling and defending the Optetrak Device. Defendants should have instead notified physicians who had implanted the Optetrak Device of the device's propensity to fail, and for some patients to develop component loosening, and/or other failure by normal use of the device. Defendant should have attempted to convey this same information to patients who had been implanted with the Optetrak Device.

263. Defendant Exactech knew or should have known that consumers such as Plaintiff Gamble would not realize the dangers presented by the Optetrak Device and would foreseeably suffer injury as a result of their failure to exercise ordinary care as described above.

264. No negligence on the part of the Plaintiff Gamble contributed to the happening of the occurrence.

265. Plaintiff Gamble's injuries and damages as recited herein, occurred directly and were proximately caused by the breach of duty to warn of the Defendant as described herein.

266. As a direct and proximate result of receiving Defendant Exactech's Optetrak Device, Plaintiff Gamble suffered serious injuries to her Left Knee and body, required medical care and attention, including additional surgery, need for future revision surgery of the Right Knee, additional hospital admission, additional

physical therapy, suffered mental anguish, pain and agony as a result of the happening of the occurrence and was otherwise injured and damaged, for which claim is made.

### Count IV – Breach of Express Warranties

267.   The preceding paragraphs are incorporated by reference herein.

268.   At all times relevant to this action, Defendant Exactech designed, developed, tested, licensed, manufactured, assembled, packaged, labeled, prepared, marketed, distributed, sold, supplied, and introduced into interstate commerce the components of the defective Optetrak Device.

269.   At all times material hereto, Defendant Exactech made certain express warranties, to Plaintiff Gamble and any users, by affirmation, promise, description, and sample that the Optetrak Device was reasonably fit for extended, safe, and normal foreseeable use as a knee joint replacement system.

270.   As set forth in specific detail above, Defendant Exactech made express representations and warranties about its Optetrak Device that include, but are not limited to:

a.    the Optetrak Device had a long clinical history and performed better than similar competitors' devices on the market;

b.    the Optetrak Device was clinically proven to reduce wear when, in fact, Defendant Exactech did not confirm that these statements were clinically accurate;

c.    the Optetrak knee system had a 98% survival rate;

d.    incidents of loosening of the Optetrak Device were not a result of any defect in the Optetrak Device, but instead blamed such incidents on surgical technique or other factors;

e.    the Optetrak Device has lower wear propensities than comparable products; and

f.    the Optetrak Device has better longevity than comparable products.

271.    Contrary to these express warranties, the Optetrak Device failed to operate properly when used in the manner for which it was intended to be used and for the purpose for which it was intended to be used.

272.    Defendant Exactech breached an express warranty under 6 *Del. C.* S. 2-313, created through advertising, promotion and product labeling, that the Optetrak Device was safe and carried no unusual risk of injury or death.

273.    No negligence on the part of the Plaintiff Gamble contributed to the happening of the occurrence.

274. Plaintiff Gamble's injuries and damages as recited herein, occurred directly and were proximately caused by the breach of the express warranties of the defendant as described herein.

275. As a direct and proximate result of receiving Defendant Exactech's Optetrak Device, Plaintiff Gamble suffered serious injuries to her Left Knee and body, required medical care and attention, including additional surgery, need for future revision surgery of the Right Knee, additional hospital admission, additional physical therapy, suffered mental anguish, pain and agony as a result of the happening of the occurrence and was otherwise injured and damaged, for which claim is made.

## Count V – Breach of Implied Warranty of Merchantability

276. The preceding paragraphs are incorporated by reference herein.

277. At all times relevant to this action, Defendant Exactech designed, developed, tested, licensed, manufactured, assembled, packaged, labeled, prepared, marketed, distributed, sold, supplied, and introduced into interstate commerce the components of the defective Optetrak Device.

278. At all times material hereto, Defendant Exactech made certain implied warranties, to the public and any users, that the Optetrak Device was merchantable, safe and fit for the intended and ordinary purpose and for normal foreseeable use.

279. Contrary to these implied warranties, the Optetrak Device was not merchantable, safe and fit because it failed to operate properly when used in the manner for which it was intended to be used and for the purpose for which it was intended to be used.

280. Defendant Exactech breached implied warranties under 6 *Del. C.* S. 2–314 that the Optetrak Device was of merchantable quality and was reasonably safe and suited for the purposes and uses for which the Optetrak Device were represented and sold.

281. No negligence on the part of the Plaintiff Gamble contributed to the happening of the occurrence.

282. Plaintiff Gamble's injuries and damages as recited herein, occurred directly and were proximately caused by the breach of warranties of the defendant as described herein.

283. As a direct and proximate result of receiving Defendant Exactech's Optetrak Device, Plaintiff Gamble suffered serious injuries to her Left Knee and body, required medical care and attention, including additional surgery, need for future revision surgery of the Right Knee, additional hospital admission, additional physical therapy, suffered mental anguish, pain and agony as a result of the happening of the occurrence and was otherwise injured and damaged, for which claim is made.

## Count VI – Breach of Implied Warranty of Fitness for a Particular Purpose

284.   The preceding paragraphs are incorporated by reference herein.

285.   At all times relevant to this action, Defendant Exactech designed, developed, tested, licensed, manufactured, assembled, packaged, labeled, prepared, marketed, distributed, sold, supplied, and introduced into interstate commerce the components of the defective Optetrak Device.

286.   At all times relevant to this action, Defendant Exactech made certain implied warranties, to the public and any users, that the Optetrak Device was safe and fit for a particular purpose.

287.   Contrary to these implied warranties, the Optetrak Device was not safe and fit because it failed to operate properly when used in the manner for which it was intended to be used and for the purpose for which it was intended to be used.

288.   Defendant Exactech breached implied warranties under 6 *Del. C.* S. 2–315 that the Optetrak Device was reasonably safe and fit for the purposes and uses for which the Optetrak Device was represented and sold.

289.   Plaintiff Gamble relied upon the skill and judgment of Defendant Exactech in selecting, designing, manufacturing, testing, marketing and selling the product for its intended and ordinary purposes.

290.   No negligence on the part of the Plaintiff Gamble contributed to the happening of the occurrence.

291.  Plaintiff Gamble's injuries and damages as recited herein, occurred directly and were proximately caused by the breach of warranties of the defendant as described herein.

292.  As a direct and proximate result of receiving Defendant Exactech's Optetrak Device, Plaintiff Gamble suffered serious injuries to her Left Knee and body, required medical care and attention, including additional surgery, need for future revision surgery of the Right Knee, additional hospital admission, additional physical therapy, suffered mental anguish, pain and agony as a result of the happening of the occurrence and was otherwise injured and damaged, for which claim is made.

### Count VII - Misrepresentation

293.  The preceding paragraphs are incorporated by reference herein.

294.  At all times relevant to this action, Defendant Exactech designed, developed, tested, licensed, manufactured, assembled, packaged, labeled, prepared, marketed, distributed, sold, supplied, and introduced into interstate commerce the components of the defective Optetrak Device.

295.  At all times material hereto, Defendant Exactech intentionally misrepresented, to the public and any users, the safety of the Optetrak Device by concealing important facts about the dangers of the knee system and by affirmatively representing that the knee system was safe during normal foreseeable use.

Defendant Exactech had a duty to warn consumers about these facts. This misrepresentation was done with the intent to mislead its customers.

296. Defendant Exactech, from the time that the Optetrak Device was first tested, studied, researched, evaluated, endorsed, manufactured, marketed, sold and distributed, and up to the present, represented and marketed the Optetrak Device as being safe and effective.

297. After Defendant Exactech became aware of the numerous risks associated with the Optetrak Device, however, Defendant Exactech failed to communicate to Plaintiff, Plaintiff's medical providers, or the general public that the Optetrak Device was not safe, fit, or effective for human use, was hazardous to health, and had a substantial propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff Gamble.

298. Defendant Exactech conducted a sales and marketing campaign to promote the sale of the Optetrak Device and willfully deceived Plaintiff, Plaintiff's orthopedic surgeon and the general public as to the health risks and consequences of the use of the Optetrak Device.

299. Defendant Exactech made the foregoing and below representations without any reasonable grounds for believing them to be true, when it knew or reasonably should have known of the falsity of such misrepresentations, including but no limited to:

a.      the Optetrak Device had a long successful clinical history and performed better than similar competitors' devices on the market;

b.      the Optetrak Device has lower wear propensities than comparable products;

c.      the Optetrak Device has better longevity than comparable products;

d.      the Optetrak knee system had a 98 % survival rate;

e.      Defendant Exactech's misrepresentations to surgeons complaining of early revisions that their experience was an anomaly not experienced by other surgeons;

f.      the Optetrak Device was clinically proven to reduce wear when, in fact, Defendant Exactech did not confirm that these statements were clinically accurate;

g.      Defendant Exactech's misrepresentation that incidents of loosening of the Optetrak Device were not a result of any defect in the Optetrak Device, but instead the result of poor surgical technique or other factors;

h.      Defendant Exactech's misrepresentation of the success rate of the Optetrak Device;

i.      Defendant Exactech knew of serious defects and dangers associated with the Optetrak Device, yet Defendant Exactech knowingly produced

and published deceptive and misleading statements and advertisements regarding the safety and efficacy of the Optetrak Device;

j.      Defendant Exactech knew, yet failed to disclose, that the Optetrak Device was failing at a high rate;

k.      Defendant Exactech knew, yet failed to disclose, that other patients experienced problems with the Optetrak Device, including but not limited to, osteolysis, loosening of the components, deterioration of the polyethylene, and reports of significant pain;

l.      Defendant Exactech knew, yet failed to disclose, that competitor products utilizing highly-crosslinked polyethylene and Vitamin infused highly-crosslinked polyethylene were performing better, had a higher success rate, and lower failure rate than the Optetrak Device;

m.      Defendant Exactech knew, yet failed to disclose, adequate information about the safety and efficacy of the Optetrak Device;

n.      Defendant Exactech knew, yet failed to disclose, that they were aware of and/or witnessed revision surgeries in which the Optetrak Device showed accelerated wear, became loose, caused osteolysis, and failed;

o.      Defendant Exactech knew, yet failed to disclose, the increased rate of wear related adverse events with the Optetrak Device;

p.    Defendant Exactech knew, yet failed to disclose, the increased incidents of loosening with the Optetrak Device; and

q.    Defendant Exactech knew, yet failed to disclose, that the Optetrak Device was improperly packaged, as identified in the Recalls.

300.   These representations and omissions were made directly by Defendant Exactech, by sales representatives and other authorized agents of Defendant Exactech, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the Optetrak Device, even though Defendant Exactech knew or reasonably should have known that such representations and omissions were false and misleading.

301.   The foregoing representations and omissions by Defendant Exactech were in fact false, in that the Optetrak Device was not safe, fit, or effective for human use, was hazardous to health, and had a substantial propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff Gamble.

302.   The foregoing representations and omissions by Defendant Exactech were made with the intention of inducing reliance and the prescription, purchase and use of the Optetrak Device.

303. In reliance on the misrepresentations and omission by Defendant Exactech, Plaintiff and/or Plaintiff's orthopedic surgeon were induced to purchase and use the Optetrak Device.

304. If Plaintiff Gamble had known of the true facts and the facts concealed by Defendant Exactech, Plaintiff and/or Plaintiff's orthopedic surgeon would not have used the Optetrak Device.

305. The reliance of Plaintiff and/or Plaintiff's orthopedic surgeon upon Defendant Exactech's misrepresentations and omissions was justified because such misrepresentations and omissions were made and conducted by individuals and entities that were in a position to know the true facts.

306. No negligence on the part of the Plaintiff Gamble contributed to the happening of the occurrence.

307. Plaintiff Gamble's injuries and damages as recited herein, occurred directly and were proximately caused by the misrepresentations of the defendant as described herein.

308. As a direct and proximate cause of Defendant Exactech's concealment of material facts as set forth above, Plaintiff Gamble suffered serious injuries to her Left Knee and body, required medical care and attention, including additional surgery, need for future revision surgery of the Right Knee, additional hospital admission, additional physical therapy, suffered mental anguish, pain and agony as

a result of the happening of the occurrence and was otherwise injured and damaged, for which claim is made.

### Count VIII – Consumer Protection Statutes

309. The preceding paragraphs are incorporated by reference herein.

310. At all times relevant to this action, Defendant Exactech designed, developed, tested, licensed, manufactured, assembled, packaged, labeled, prepared, marketed, distributed, sold, supplied, and introduced into interstate commerce the components of the defective Optetrak Device.

311. At all times material hereto, Defendant Exactech violated the applicable consumer protection statutes including the Delaware Consumer Fraud Act, 6 *Del. C.* ss 2511-2560 through unfair and/or deceptive merchandising practices by mislabeling and misrepresenting the quality, uses and benefits of the Optetrak Device.

312. Defendant Exactech constitutes a "person" within the meaning of Delaware Code 6 *Del. C.* 2511(7).

313. Defendant Exactech's Optetrak Device constitutes "merchandise" within the meaning of Delaware Code 6 *Del. C.* 2511(6).

314. The promotion and sale of the Optetrak Device by Defendant Exactech constitutes a sale of merchandise within the meaning of Delaware Code 6 *Del. C.* 2511(8).

315. Defendant Exactech engaged in unfair and/or deceptive merchandising as described above by:

    a.     knowingly and intentionally misrepresenting that the Optetrak Device had approval, performance characteristics, uses, or benefits which it did not have;

    b.     knowingly and intentionally misrepresenting that the Optetrak Device was of a particular standard, quality, or grade when, in fact, the product was not of that standard, quality, or grade; and

    b.  knowingly and intentionally concealing, suppressing, and omitting material facts with intent that others rely on them.

316. These actions meet the definition of "unfair or deceptive merchandising practices in the conduct of any trade or commerce" as set forth in Delaware Code section 6 *Del. C.* 2512 and 2513(a).

317. As a direct and proximate cause of Defendant Exactech's violations of the applicable consumer protection statutes including the Delaware Consumer Fraud Act, Plaintiff Gamble suffered serious injuries to her Left Knee and body, required medical care and attention, including additional surgery, need for future revision surgery of the Right Knee, additional hospital admission, additional physical therapy, suffered mental anguish, pain and agony as a result of the happening of the occurrence and was otherwise injured and damaged, for which claim is made.

## Count IX – Punitive Damages

318. The preceding paragraphs are incorporated by reference herein.

319. In addition to Defendant Exactech's negligence, carelessness and recklessness as detailed herein, Plaintiff also alleges that Defendant Exactech's conduct, acts, and admissions were so grossly negligent, willful, wanton, and malicious and done with a conscious disregard for the rights and safety of Plaintiff and other users of the Optetrak Device and for the primary purpose of increasing Defendant Exactech's profits from the sale and distribution of the Optetrak Device.

320. Prior to the manufacturing, sale, and distribution of the Optetrak Device, Defendant Exactech knew that the Optetrak Device was in a defective condition as previously described herein and knew that those who were prescribed the Optetrak Device would experience severe physical pain, mental, and emotional injuries.

321. Further, Defendant Exactech, acting through its officers, directors, managers, and agents, had knowledge that the Optetrak Device presented a substantial and unreasonable risk of harm to the public, including Plaintiff Gamble and as such, said consumers of the Optetrak Device were unreasonably subjected to risk of serious injury from the use of the Optetrak Device.

322. Despite such knowledge, Defendant Exactech, acting through its officers, directors and managing agents for the purpose of enhancing Defendant

Exactech's profits, knowingly and deliberately failed to remedy the known defects in the Optetrak Device and failed to warn the public, including Plaintiff Gamble of the extreme risk of injury occasioned by said defects inherent in the Optetrak Device.

323. Defendant Exactech and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution, and marketing of the Optetrak Device knowing persons would be exposed to serious danger in order to advance Defendant Exactech's own pecuniary interest and monetary profits.

324. Defendant Exactech's conduct, acts, and admissions were so grossly negligent, willful, wanton, and malicious and done with a conscious disregard for the rights and safety of Plaintiff and other users and for the primary purpose of increasing Defendant Exactech's profits from the sale and distribution of the Optetrak Device that the Plaintiff is entitled to punitive damages under 18 *Del. C.* §6855.

### Count X – Loss of Consortium

325. The preceding paragraphs are incorporated by reference herein.

326. As a direct and proximate result of the injuries and other losses to his wife Plaintiff Gamble, husband-plaintiff, Plaintiff JAMES GAMBLE, has been deprived of the society, consortium, companionship, comfort, and services of his wife and will continue to be deprived for an indefinite time in the future, all to his great detriment and loss.

327.   As a direct and proximate result of the injuries and other losses to his wife Plaintiff Gamble, husband-plaintiff, Plaintiff JAMES GAMBLE, has also sustained and may in the future incur financial losses directly and proximately caused by the injuries to his wife, including various and substantial expenses to pay for the medical and rehabilitative attention, care, and treatment of his wife, and will be obliged to expend such sums or incur such expenditures for an indefinite period of time in the future, all to his great financial detriment and loss.

WHEREFORE, as to all counts asserted herein, Plaintiffs demand judgment against Defendant Exactech, jointly and severally, for general and special damages, loss of consortium, plus punitive damages against Defendant Exactech for their negligence, carelessness and recklessness, plus interest, costs, and attorney fees in an amount to be determined by a jury.

/s/ Andrew C. Dalton
Andrew C. Dalton, Esq. (#5878)
DALTON & ASSOCIATES, P.A.
Cool Spring Meeting House
1106 West 10th Street
Wilmington, DE  19806
(302) 652-2050

DATED:  April 19, 2024          *Attorney for Plaintiffs*